Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning ladies and gentlemen. We have four cases on the calendar this morning. A case from the Court of International Trade, one from the Federal Circuit. Our first case is China Manufacturers Alliance v. United States, 20-1159. Mr. Todor. May it please the court. We respectfully request that the court reverse the Court of International Trade's decision that ordered the Department of Commerce to apply to the foreign producer DoubleCoin the rate that Commerce had initially calculated based on DoubleCoin's data instead of the China-wide rate that Commerce applied after DoubleCoin failed to establish its independence from Chinese government control. Mr. Todor, as Judge Clevenger, I'd like to interrupt you if I could for just a second to ask you basically an administrative law question. I'm looking at joint appendix page 177, which you must have in front of you. This is where the agency is responding to the challenge to its legal authority to have promulgated the DRC-wide rate in this case. It looks to me like the authority relied on is regulatory, basically the NME regulation, 351-107-V. Do you agree to that? That is the... Okay, so I'm looking at page 177 of the appendix. I see that there is a citation to that else. It's the government's position in response to the challenge that there wasn't proper legal authority for the PRC rate. What I'm trying to do is it looks to me like the rationale that you're using there was the rationale that was invalidated in 2N1. Okay, so first we would point to the citation to this court's SGMA decision there in the Department of Commerce's explanation of its authority where... Yes, I appreciate that. Secondarily... And the 2N decision dealt with all that, as you know. Yes, and the 2N decision, there were two decisions in 2NN. The Court of International Trade in this case relied upon the first case in 2NN that found that Commerce had not given an adequate explanation of the statutory basis under 1673-B-C1-B1. Upon remand in that case... Go ahead. Please continue, Your Honor. Well, the problem I have, sir, is I feel in the same position Judge Kelly was in when you first presented to them the argument that this was not a 351-107 rate, but instead was a 1673-D rate. What we were saying in 2NN and what Commerce said in 2NN upon remand and then was affirmed in 2N2, as we discussed in our reply brief, is that Commerce clarified that the 351.107 regulatory rate was a subset of individually investigated rates under 1673-D-C1-B1-1. Right. Now, in this case, we asked for a remand, a voluntary remand from the court to apply the effect of this court's decision in Diamond Sawblades, but the court denied Commerce's remand request and instead ordered imposition of the individually calculated rate in its second decision in this case. In 2NN, the court in International Trade remanded for Commerce to give explanation on this issue. In this case, the court didn't give Commerce a remand, so that's why that additional explanation does not appear in the record of this case. However, it is our position that it is an individually investigated rate and, therefore... My point is just a pure administrative law question. It seems to me that what you were doing in this case, 2NN hadn't happened yet, so you were relying on previous law where you had never asserted that it was a 1673-D rate and that you're now asserting that in your reply brief. It seemed to me as if you were shifting grounds. Well, again, the context of that is that the court did not give Commerce a remand either for explanation, largely because we believe in the second opinion of the court. Right, and 2N1 invalidated that rationale and you didn't choose to appeal from that. It became a final judgment. Well, the court in 2N1 affirmed Commerce's remand determination, which included the explanation that it was an individually investigated rate. And there was no appeal taken by either party after the remand in 2N1. So, 2N1, although it's a CIT decision, after remand affirmed Commerce's reasoning for application of the countrywide rate as an individually investigated rate. And we think that the same rationale should apply here, although in this case... ...or Transcom, because 1673-D was enacted after those cases. We had also, in our papers, relied upon Michael Storrs, AMS, Albemarle, Yankee Best Pack, and I believe at least one other case that was enacted after the enactment of the post-GATT version of the anti-drug statute in 1995. And in those cases, they... Thank you. I don't want to eat up any more of your argument. Thank you. And with respect to it being an individually investigated rate, as we said, the court did not order a remand, as happened in 2N1, for further clarification of that. It was our explanation that the court's reasoning was that the court concluded, although it found 2N1 persuasive, it found that as the basis of its holding, it's holding that because Commerce not made an affirmative factual finding that there were other Chinese state-owned producers who made exports during the period of review, it was unnecessary for it to reach that question, although it called the statutory authority into question. And certainly, if the court were to look at that, we think the appropriate response would be either to affirm Commerce's reasoning for the same reasons as in 2N1-2 or for remand for the same clarification given in 2N1-2. However, with respect to the basis for the court's opinion with respect to the existence of other producers, to clarify, the court in its previous question was referring to Commerce's issues and decisions memorandum at page 177. As we noted in our brief at page 179, I believe Commerce stated that there was no information in the record as to whether there were other producers who were state-controlled who made exports during the period of review, and therefore, because... Counsel, this is Judge Laurie. Isn't there just looking basically at the language, an inconsistency between a China-wide rate and an individually investigated rate? China-wide and individual seem to be opposites. In this case, the... First, Commerce gave the explanation in 2N1, which isn't in the record in this case, for why it considered it to be an individually investigated rate. The basic reason was because Commerce applies the presumption of state control to all firms in a non-market economy, country absent the rebuttal of that presumption. It investigated the entire state-owned entity as an individually investigated rate in the investigation and carried that rate forward to future reviews. So, that's the basic explanation for why Commerce believed it to be an individually investigated rate. So, it was not an individual investigation of a particular firm. In fact, Commerce found that DoubleCoin's data was a part of the state-owned entity and, therefore, incorporated into the state-owned rate for the purposes of this administrative review, but it did not review the entire scope of potential firms as it did in the investigation. In the investigation, Commerce sent out questionnaires, found, I believe, to 94 different firms, of which 36 didn't respond, and, therefore, imposed the adverse China-wide rate in the investigation. Here, Commerce didn't send out questionnaires to all those firms again. It's not obligated to in each successive review. And that's the factual distinction between this case and what the court was talking about in Diamond Sawblade because, in that case, it was the first administrative review, so they were reviewing all the firms that were investigated in the investigation over again. Mr. Turner or Ms. Lovinger again, in the administrative proceedings, as well as in various court filings, you referred to having conditionally reviewed the PRC-wide entity. I don't understand what a conditional... I think, for this proceeding, you said you conditionally reviewed the PRC-wide entity. What's a conditional review? Our understanding is it was similar to what happened in Diamond Sawblade, which is, if there was a firm that was individually made a mandatory respondent that was found to be state-controlled, Commerce incorporated that entity's data into its state-owned rate. And that procedure was discussed in Diamond Sawblade and was affirmed by this court. So, the incorporation of the data is what the conditional review is? Right. So, the initiation of the administrative reviews gave notice that the China-wide rate was under conditional review, meaning it could change based upon the results of data that was received during the review and gave opportunity to request a review of the entity as a whole. No party requested a review of the entity as a whole, but Commerce did make a change to the rate because it incorporated DoubleCoin's rate and averaged it with the pre-existing China-wide rate to come up with the 105% as opposed to 210% rate that initially applied. What the court did in this case, the Court of International Trade did, was it said that the only state-owned China-wide rate that could conceivably be applied is based upon DoubleCoin's own data because Commerce did not make an affirmative finding as to whether other state-controlled producers made exports during the period of review. We disagree with that because Commerce was not under an obligation to reinvestigate the composition of the China-wide entity in each successive review. So, that is our understanding of what the conditional means. My take on your case, sir, was that if we're satisfied that there is sufficient proper legal authority for having promulgated the PRC-wide rate here, then Diamond Saw Blades basically answers all the other questions. And that Diamond Saw Blades can't be distinguished on the factual basis asserted by your adversaries. That is our understanding. Specifically with respect to Diamond Saw Blades, the Court of International Trade and DoubleCoin are arguing that Diamond Saw Blades, there was a finding that there were other state-owned producers during the period of review and that distinguishes the case. That's the only distinguishing point that they come up with. It would certainly be extremely unusual for Diamond Saw Blades as well as all the other cases from Sigma forward that we cite to affirm Commerce's imposition of rates for state-controlled entities with a state-wide rate and all of a sudden discover that there is no authority to do so. That would certainly be extremely unusual and we don't think it's warranted. We think that the Court in all of those cases understood the statutory basis for that and properly affirmed that. With respect to the factual distinction, we don't think that factual distinction is germane. Wait, wait, wait. Let me be technical here. You've already admitted that because the statute was enacted after Sigma and Transcom, those cases aren't pertinent to your theory. Well, we don't think they – we think they are pertinent because… The statute that you rely on doesn't exist at the time those cases were decided. Well, certainly Diamond Saw Blades, for example, in 2017 cited, I believe, Sigma in the very footnote where it found that the Court of International Trade's first opinion in this case was not persuasive. So, we think that certainly the same reasoning does apply. And so far, Sigma and Transcom were enacted before the post-GATT changes to the statute. Michael Storrs, Diamond Saw Blades, AMS, and the others were enacted afterwards. So, we think that that is the Court's position and certainly the Court's reasoning, disagreeing with the Court's reasoning in the Court's initial opinion in this case in Diamond Saw Blades. Thank you, Counsel. We are well into rebuttal time. Why don't we hear from the other side? Thank you, Your Honor. Mr. Derling. Yes. Thank you, Your Honor. Can everyone hear me okay? Yes, we can. Pleased to see. Great. May it please the Court. At its core, this case is about whether there is any basis to conclude that the anti-dumping assessment rate applied to imports by CMA is, in fact, an individually investigated rate. The record of this case shows that it is not an investigated rate. Because the underlying anti-dumping order has been revoked, this case, at this point, only concerns the anti-dumping liability to be paid by a U.S. importer, CMA, for specific import entries made during a specific review period. Mr. Derling, aren't you in real trouble because of Diamond Saw Blades, where we said the fact that cooperation does not, without more, save it from a countrywide rate? And then in the footnote, we said this very case, this decision, does not comply with our precedent. Your Honor, with all due respect, we don't think Diamond Saw Blades is a bar here, and let me explain why. When you wrote that footnote in Diamond Saw Blades, you were reacting to Judge Stansu's decision in CMA 1. And it's in CMA 2 that Judge Stansu very painstakingly goes through important distinctions between the record of that case and the record of this case. In particular, Judge Stansu stressed that in Diamond Saw Blades, there were multiple, 21 other parts of the NME entity that were before the court, were part of the case, and for which there was no cooperation. And in fact, in footnote 2 of Diamond Saw Blades, this court took great pains to stress the presence of these 21 non-cooperating companies. So Judge Stansu noted the key difference in this case, which is that there were no other parts of the NME entity. The only part of the NME entity that was part of this review, that had entries during this review period, was the CMA imports from DoubleCoin. And Judge Stansu took great pains to explain that Commerce had not directed any questions to the rest of the NME entity. There was nothing at all. In fact, Judge Stansu also took great pains, and this is at page 33 of the slip-op version of his decision, he took great pains to note that in this case, in the decision memo in this case, at page 19, Commerce specifically found that there was no lack of cooperation from any of the other parts of the NME entity. So you have a totally different factual record, and you have a totally new decision by Judge Stansu in CMA 2 that goes through systematically in a case where you have no lack of cooperation. He went through what record information was before Commerce, and what decision could be made about the assessment rate for these import entries given the information that was before Commerce on this particular record. And he stressed correctly that given the statutory provision governing the use of facts available, Commerce's factual finding in this case that there was no lack of cooperation and no evidence in this case that there were even any other entities or entries at all. We don't know. Commerce makes a big deal in its reply brief about Commerce isn't under any duty to investigate, but that kind of misses the point because at the end of the day, the question is what record information did Commerce have for making its decision? We agree that Commerce has discretion about how to frame its investigation, but Commerce must then live with the consequences of its choices. Commerce cannot refuse to investigate whether there were any import entries by other parts of the NME entity. Commerce cannot refuse to seek any information from any other parts of the NME entity. Commerce can refuse to even seek to confirm whether in fact during this period of time there were any other parts of the NME entry. Instead, what we have here is Commerce speculating, reaching back almost a decade to old, stale factual findings which may or may not still be true. So, no new investigation, no facts on the record here. Commerce then has to live with the consequences of having narrowly focused its investigation and has to make a decision that is consistent with the factual information that it actually did collect. Now, this is particularly true in this case because in this case the only entries we're talking about are those imported by CMA. The statute specifically requires Commerce to determine an assessment rate, the dumping liability, for these specific entries. That's 19 U.S.C. 1675 A1B. They have to determine the assessment for specific entries and what information do they have for making a determination about the proper dumping liability for these specific entries. It's not enough for Commerce to mention in passing in its notice of initiation, mention in passing the NME entity. Indeed, it's Commerce, both through its policies and how they were applied in this case, it's Commerce that adopted policies to narrow its inquiries in administrative review to only those companies for which a review is requested and for only those actual entries during the review period. There's no such thing as an unspecified portion of the NME entity in an administrative review like this case. The review can only happen, Your Honors, if there are actual import entries being made during the review period. And as Judge Stansu went through very systematically in CMA 2, with respect to this entity, imports by CMA from DoubleCoin and these particular entries, the only information that Commerce had on the record that would comply with all of the statutory limitations is the information that Commerce collected and investigated and evaluated and verified for the CMA entries. So in our view, Judge Stansu was correct. This is Judge Klobuchar. The problem is that, indeed, an individually investigated rate was established for DoubleCoin CMA. But the problem is that CMA DoubleCoin is not lawfully entitled to that rate because they failed to prove independence from the Chinese control. So you have to start with that proposition. So your client is clearly not entitled to its 0.14 de minimis rating based on its individual investigation? No, Your Honor, if I could clarify, what Judge Stansu said was not that he was imposing the individually investigated rate because CMA itself was cooperating and thus was entitled to the individually investigated rate. That wasn't Judge Stansu's premise at all. Judge Stansu correctly took this court's guidance from Diamond Sawblades and understood that he had to take as a given the failure to rebut the presumption and all of that. He basically said, okay, fine, failure to rebut the presumption on the fact of the case. I appreciate what he said. Judge Stansu was basically saying that he's not going to apply the PRC-wide rate to your client because your client cooperated and he thinks it's a dirty pool to do an AFA rate on a cooperating party. Actually, Your Honor, that's clearly what he was saying, right? Well, that's what he was saying in CMA 1, Your Honor, but that's not what he was saying in CMA 2, which is what's at issue here. In CMA 2, he was not relying on the kind of unfairness of all of this. He took your guidance from Diamond Sawblades. Instead, he said, on this case, given the facts Commerce had in this case, what is a permissible PRC-wide rate? He basically said, well, it can't be the carry-forward rate because the carry-forward rate is hugely inflated by adverse facts available. Since Commerce found in this case no lack of cooperation, it did not have a legal basis to impose an AFA rate for the PRC-wide entity, right? The whole premise behind the PRC-wide rate is this notion of kind of failure of information, unspecified portions, missing information, lack of cooperation, basically a reason to impose the punitive rate, which in this case was more than 200% from the original investigation, a clearly punitive rate based on the lack of information, lack of cooperation. It was basically the petition-alleged rate. It wasn't even based on anything involving any of the parties. So Judge Stansu said, under the statute, Commerce is not allowed to use an AFA rate without some evidence that someone didn't cooperate, someone failed to provide the information that had been requested, but in this case, there was no failure to provide information by any party, not by CMA, not by any other alleged parts of the NME entity, not by anyone. To the contrary, in this case, Commerce made a specific factual finding that all parts of the PRC-wide entity were, none of them were found to be non-cooperative. And that finding, Commerce can't run away from that finding. Commerce tries to ignore the implication of that finding, but Commerce can't run away from it, and that's the reason why Judge Stansu said you can't just pull forward this inflated adverse facts available rate. So we think this case can be decided based on the unique facts of this case, but, Your Honors, even if you were to find that you weren't persuaded by these fact-specific arguments, we would urge you to go back and address our other argument, which is the restriction on the ability to impose a third type of rate. Because with all due respect, we understand Commerce's shift in position here, but in this case, Commerce made an administrative determination that was grounded in its belief that it could impose this third rate, and in its briefing to Judge Stansu in the earlier stages of this case, it emphatically defended its right to impose a third extra statutory rate. We submit that is not permissible under the statute, and the court should clarify that point. The judge should resolve this issue. I mean, the court should resolve this issue that is now being debated in case after case after case in the CIT and make clear that in every case, Commerce has to make clear, is the rate an investigated rate or an all-others rate? And most importantly, Your Honors, if it is an investigated rate, the facts have to show that an investigation actually took place, and there has to be evidence on the record that the court can review in that particular proceeding that shows the investigation. The court doesn't need, for this case, the court doesn't need to address how much an investigation is needed, because in this case, there was no investigation at all. And when there's no investigation at all, in our view, there cannot be an investigated rate. And in closing, Your Honors, that's the thought I would want to leave you with. In this case, the reason that this court should uphold Judge Stansu's decision and should not allow Commerce to impose a punitive 100% dumping liability on these entries by CMA, the reason is that the uninvestigated parts of the NME entity in this case, they weren't part of this particular review. And Your Honors, these other entities, if they exist at all, can't answer questions that Commerce never put to them. And that's the essential teaching of the statute and all of this court's decisions that apply the statute to limit Commerce's discretion when using adverse facts available. Commerce has to ask questions, there has to be some refusal to answer the questions, and that is the predicate under the statute for imposing the punishment of an AFA rate. If there are no other questions from the court, I have concluded my argument. Thank you, Mr. Durling. Mr. Todor, we'll give you your three minutes of rebuttal back. Thank you, Your Honor.  It was the original investigation where Commerce sent the questionnaires to the 94 firms. 36 didn't respond. That was the reason for the adverse facts available rate from the investigation that was carried forward. That's the same procedure that this court affirmed in Diamond Salt Lake. The only actual distinction that the Court of International Trade is relying upon, because this is a later review, Commerce did not go out and reinvestigate the composition of the PRC-wide rate in this particular review, but Commerce was not obligated to do so. There's nothing in the language individually investigated in 1673C1B1 that would provide such a pointed instruction to Commerce to go about it. This court noted in Diamond Salt Lake and Albemarle in particular, that although the statute does not specifically direct how Commerce is to do the investigations or reviews in the cases of non-market economy countries, nevertheless, it noted Commerce's practice and has repeatedly affirmed Commerce's application of that practice, including the procedure that was followed in this case. Commerce did not make an affirmative finding that there were no other producers from the PRC during this period of review. Instead, as noted on page 179 of the record, it just said that there was no information as to sales and production from any other firms. DoubleCoin argues that the lack of this reinvestigation means that Commerce would need to assume that there were no other such producers, that the only state-controlled producer was DoubleCoin, but that's not how the review was conducted nor how it was required to be conducted. Commerce received specific requests for review for individual firms and then issued the request for those firms. Of course, DoubleCoin was chosen as a mandatory respondent, which is why its data was initially calculated, but then not given its own rate because it did not rebut the presumption of state control. Nothing in the statute or regulations that DoubleCoin has pointed to or that the Court of International Trade pointed to would compel Commerce to reinvestigate the entirety of the PRC-wide entity in each successive review in order to be able to continue to apply the PRC-wide rate to firms that did not rebut the presumption of state control, the same procedure that this Court affirmed in Diamond-Soblick. For those reasons, we respectfully request that the Court overturn the decision of the Court of International Trade and reinstate Commerce's application of the 105% rate that it initially calculated for DoubleCoin as the PRC-wide rate. Thank you. Thank you, counsel. We appreciate both arguments. The case is submitted.